May it please the Court. Counsel. Good evening. Patrick Cassidy here to represent the defendant's There's four issues in the briefs before you today, and I'm happy to answer any questions you have on any of those issues. But I'd like to focus my argument on issue two, unless there are any questions. Issue two involves the videotaped statement of the child, MG, to an interviewer named Denise Payton, conducted three days after the incident. This videotaped statement was played twice at trial and probably is a significant part of the state's case, particularly with regard to count two, which is an allegation of mouth-to-genital contact. And Ms. Perez is serving 39 years on that case. Your Honor, this videotaped statement was only admissible under Section 115.10 if the trial court found that the time, content, and circumstances provided sufficient safeguards and reliability. And under People v. Zwart, the only Supreme Court case, they've said that the state bears the burden of showing that it was reliable and that there was no adult prompting or manipulation. In other words, if the statements of the child are the product of substantial adult intervention, the video would not be admissible. Here, watching the video, we see substantial adult intervention. Prior to this video, MG had not made any allegation of mouth-to-private contact. She told her mother that Mr. Perez spit on her privates. She told Pearl at her ankles the same thing, that Mr. Perez spit on her. And in fact, at the outset of the interview with Denise Payton in the video, when MG's allowed to use her own words, she said the defendant spit on her privates. So how do we get from that to an allegation of contact between the mouth and the private parts that will support a predatory criminal sexual assault conviction in a 39-year sentence? Well, we watch the video, and we see that it's the product of suggestive interviewing. So as I said, MG tells the interviewer, in response to the question, did anything go in your body, she said, he spit it right here. And then she points to her private parts, and then on a diagram of the child, to private parts of the child. The interviewer, Denise Payton, takes that to mean that there was contact. She responds, he had his mouth on your private. Okay. And then she proceeds to ask a series of questions that takes that as a given, that there was contact. So she follows up asking whether, again, whether anything went inside the child's body. This is the way she asks it. When he had his mouth on your private, did you feel anything going inside your body? Now, MG answers no. But when she's asked that question, she's heard this assumption that there's been contact. Payton does this again, this time asking about how long the incident occurred. When he had his mouth on your private, how long do you think he had his mouth on your private? MG holds up one finger, meaning one minute. But again, so she's answering the question about time, but she's been told twice in that question that there's contact between the mouth and her private. And was that the first time in the interview the mouth, the private contact, came up? Yes, Your Honor. I believe the state and us are in agreement that Payton was the first one to say mouth on private. Private prior to that, MG said he spit it right here. And Payton didn't follow up by saying, well, you know, and then Payton follows up and says, where was his mouth at? And she says right here. She doesn't say, well, did he touch you? Did his mouth touch you? She doesn't follow that up. Instead, she takes it as a given that there's contact and then proceeds to ask a battery of questions with that as the assumption. And then she goes further, though, and asks two questions that expressly conflate spitting with contact. And of course, there's a 39-year sentence difference between these two acts. So she says, when he had his mouth, when he spit on you and put his mouth on your private, was your body on the bedspread? Was he holding you? Where were his hands? MG says his hands were on the bed. But she's just heard the interviewer tell her that what she said, spitting, and what the interviewer was saying, mouth on her privates, these are the same things. And this happens again. Payton then says, so you said that he put his mouth on you. He spit on your private for a minute. And you said you didn't feel anything go inside you. Am I right? And she confirms that again. She did not feel anything go inside her. In confirming, she's hearing that the interviewer believes these are the same things. Spitting, mouth on, private contact are the same for the interviewer. And MG, a six-year-old child, is going to understand that to be the same. And so this, I think, is a textbook case of how you create an accusation, a false accusation from a child. The protocol that this interviewer was allegedly using, the RAPTAC protocol, expressly prohibits assumptive questions. You're not ever to introduce facts into an interview with a child before the child introduces them. And that's what Payton has done here several times. And she introduces facts, and then she conflates two very different acts that the law treats very differently. And so we see substantial adult intervention in this interview. And so we believe it was error of the trial court to admit it under Section 115.10. Suggestive questioning doesn't safeguard reliability. It induces unreliability. So the question then becomes, you know, what's to be done about it? And that's where we point out that this error is preserved. It was litigated before trial and subjected to at trial and in the post-trial motion. So it becomes a state's burden to show that it's harmless. In other words, that it could not have contributed to the jury's verdict. And here, this video was played not once but twice at trial. The second time was actually during deliberations. The jury sent out a note requesting to see the video. And when a video is played during deliberations, I don't think it can be argued that it could not reasonably have contributed to the verdict. So we think that we have a harmful error here and that we need to have remand for a new trial. And the state has not carried or tried to carry this burden. There's no questions about Issue 2. I'd like to say a few words about Issue 3. It relates, again, to the credibility of the child. The defense here was, I think we all agree, try to show that NG wasn't credible. Try to create reasonable doubt. How do you show that? Well, you're trying to show that her story changed. And the defense did show that her story changed. At trial, she says for the first time that there's hung to private contact. Yet the defense shows that she doesn't say that to Perla or Judith. In the day after the incident. And the defense also showed that she never made that allegation to the two doctors or to the nurse who interviewed her or examined her in the two days after the incident. They engaged in stipulations of what NG told them. And NG didn't make any statements about the incident at all to these doctors or the nurse. And the nurse, in fact, testified on direct that she told me word for word what was in the stipulation. She would not say anything about the actual events. And so the defense had shown what they wanted to show. They had shown the story that it changed. But then defense counsel elicited from the nurse across examination. Beyond the stipulation, the nurse was allowed to testify that, oh, in fact, she told me that the defendant either licked, sucked, or kissed private parts. Well, now this really torpedoes the defense theory here. Now the jury's hearing that, no, the story hasn't changed at all. This was unreasonable assistance of counsel because, again, the stipulation, which is what the nurse testified was word for word what she heard from NG, didn't include this allegation whatsoever. There was no need to ask her any questions about anything else. You already proved via stipulation what you wanted to prove. And then it was also unreasonable not to move to strike this answer. Strikes are the heart of your case, and as the state concedes in their brief, a motion to strike would have likely been granted because it was a non-responsive answer. And so we think that the defendant was prejudiced by that because, again, their only attack here, their only defense was, for a reasonable doubt, having the jury wonder, well, has NG told a consistent story? And that defends this torpedo. That defends. So we think that's another reason why this court should reverse the command for a new trial. Are there no further questions or comments? Thank you. Thank you, Mr. Cassidy. Mr. Austin. May I please court? Counsel. Counsel didn't discuss issues one and four, and so I will reserve my comments to the issues two and three that he discussed here before the court. In his second issue, the defendant asserts that the videotaped interview of the victim, NG, with Denise Payton, who is an investigator with the Child Advocacy Center, should not have been admitted into evidence. In his main brief, the defendant alleges that the video shows that Ms. Payton used improper techniques to manipulate and change NG's account of the crime. In his reply brief, the defendant asserts that when Ms. Payton questioned NG, Payton changed NG's words to indicate not that the defendant had spit on her private, but instead had put his mouth on NG's private. Now, being a six-year-old, NG would not have any kind of frame of reference for oral sex, and it was reasonable for her to have described the act as defendant spitting on her private, which, of course, was NG's word for her vagina. In his main and in his reply briefs, the defendant quotes a portion of the interview where NG made clear that the defendant had put his mouth on her vagina.  The quote in the interview shows that Ms. Payton did not lead NG into indicating that the defendant had put his mouth on her vagina. When Payton asked NG he had his mouth where, NG replied, right here, and she pointed to her vaginal area. There is no reasonable interpretation of NG's answer and her accompanying gesture other than that the defendant put his mouth directly on NG's vagina. Now, the defendant asserts that Ms. Payton conflated the act of spitting with the defendant's act of actually placing his mouth on NG's vagina, but nowhere in the record did NG contradict or attempt to correct Ms. Payton whenever Payton said the phrase, he had his mouth on your vagina, or on your private is the way she put it. Well, but it isn't, I mean, you have a six-year-old kid, isn't that the point against you don't have suggestive questioning because kids are less apt to try to correct their questioner? Certainly, and the protocols are set up that way. That is correct. But we also have to remember that in her own testimony NG stated that the defendant had put his tongue on her vagina. She called it her private, of course, at that point. And the defendant also asserted that the interview with NG was not conducted under circumstances that provided sufficient safeguards or reliability, but of course the record shows that the interview was conducted in a controlled environment and using what is called the RADC protocol. Now, that wasn't described in any kind of detail in the record. They didn't go into what that protocol was, and that's been accepted by Will County Child Advocacy Center Board, and it was videotaped recording an interview, of course. Nowhere during the interview in the controlled environment did the child use the phrase or the words herself that he put his mouth on her. Not that I recall, Your Honor, not the actual words, but she responded in such a way to make it clear that, yes, he put his mouth right here. Now, prior to the hearing on the people's motion to admit to videotape and to evidence, the videotape interview had been viewed by Jacqueline Lundquist. Now, she's a forensic interviewer with the Child Advocacy Center, and Lundquist affirmed that the interview complied with the RADC protocol. And, of course, following that hearing on the admission of this DVD, the trial judge found that Peyton's questions had not been leading and that the defendant had placed his tongue on MG's vagina. And so the trial judge found that there was sufficient safeguards of reliability regarding the admission of the interview. Moving on to the third issue, the defendant asserted that defense counsel was ineffective when she elicited testimony from Nurse Aholic that was contrary to the stipulation that had been read into evidence. Now, in his brief, the defendant asserted that defense counsel undermined the defense theory that MG was not credible in light of the difference between her testimony and her trial and her initial statements to the family and medical personnel at the time. The defendant asserts that his counsel undermined the defense theory when she elicited testimony from Nurse Aholic that was contrary to the stipulation. As the defendant admitted in his brief, Aholic gave a non-responsive answer to a direct question. There were two counsels, and the co-counsel who was not doing the examination at the time objected immediately. And, of course, the trial judge did not rule on the objection because the examining counsel didn't make it. The counsel who was doing the examination of Aholic did not reiterate the objection, but she redirected Aholic to the stipulation. She asked, does it say touch in this portion? And Nurse Aholic eventually admitted that the word touch was not in the stipulation. So it was clearly trial strategy to continue to question Nurse Aholic to confirm that her report that she had written at the time that she interviewed M.G. did not contain the word touch. Rather than to restate that objection, which would have accomplished striking, potentially, this language, it got to the heart of the matter. At the time that she interviewed M.G., M.G. never said the word touch. So defense counsel was hammering away at the point of what did M.G. state at the hospital. But if the objection is made, is nonresponsive, and the answer is stricken, then there's a piece of pretty critical evidence that the jury doesn't get to consider in reaching a verdict. Generally, you would expect that to be true. And without that objection, and notwithstanding, a pretty good cross-examination about, well, this is what you said down here in the stipulation, but without that objection, and without a ruling from the court striking that, notwithstanding that cross-examination, the jury can't consider the evidence of the nurse's testimony. Well, they would have heard that, but they also would have heard the continuing questioning, is this what this said? Is this what this said? And Aholic finally says, no, it didn't say touch. All right, so she contradicts what she had stated earlier, and she says what it really said. It does not include the word touch. So the jury hears this, and that will override this nonresponsive answer, because she has just pointed out that her earlier answer is not credible. It's not in there. And if she had been an invasive and hostile witness, and everybody could see this going on, if she didn't answer direct questions from defense counsel about whether M.G. had stated to her that the defendant had penetrated her, and also about whether the report that Aholic prepared showed that M.G. told Aholic that the defendant had touched her, it is because of these invasive answers that defense counsel was required to repeatedly question her about this stipulation and whether that stipulation indicated that the defendant had touched M.G. That's the only reasonable defense to these charges. Part of the defense strategy in the record shows that they had been trying to show that M.G.'s mother had been angry about defendant dating another woman while the mother was pregnant with defendant's second child, and that the mother was using M.G. to try to get revenge on defendant through the child. If defendant had gotten Aholic to admit that M.G. had not told her that defendant had penetrated or touched M.G., then this would have cast doubt on M.G.'s testimony, which was the clear winner for people. But the stipulation didn't include anything about touch anyway. So she didn't need to go beyond the stipulation. It could have gone beyond the stipulation, I presume, but because there was a direct examination, we have a cross-examination, and what the cross-examination further brought out was that the stipulation did not use the word touch. Okay, and I just want to ask you about your idea that this is trial strategy. I understand that you may be saying that it was trial strategy to continue to follow up, but how is it trial strategy to screw up in the first place? Well, I think the initial screw-up, as you put it, was not on the part of defense counsel. It was a non-responsive answer about what the stipulation was saying, what was in there, and she basically made up an answer that was not in the stipulation. But the answer that she made up was not damaging the way that the follow-up questioning was damaging, prejudicial, if you will, to the defendant. Well, I submit that it actually was a stronger strategy to get her to admit what was in the stipulation, that the stipulation did not say touch, and by showing that she was evasive and not wanting to answer these questions, it was a stronger point to the jury that her initial non-responsive answer should not have been listened to or given any credence. But even trial lawyers seem to accept that if you got an evasive witness or something like that, by making the objection and motion to strike and giving now the judge, the guy sitting up there in the black robe, to say, you know, your objection is granted, that evidence is stricken, and Madam Witness, would you please just answer the question, or maybe something like that. And so now you're pointing out to the jury that even the judge thinks this witness is going out there. I mean, that's part of the art, I guess, or nothing else. A trial lawyer, when you've got a perfect opportunity to let the trial judge step on this witness that is evasive and fighting you, then it doesn't look like, well, you don't like her answers because you're representing this particular client. And it seems to me that getting that judge and, well, let me ask you this. Is there any doubt in your mind that had the motion to strike been made, that it would have been granted? I can't say yes or no, Your Honor, because I don't know what would have been the trial judge's mind. Let me ask you this. Let's just talk about the law. I mean, if he hadn't have granted it, do you think it would have been error? Generally speaking, probably. You know, probably it would have been granted. And if it hadn't been granted, it probably would have been ruled error at some point. I don't deny that that generally would be the case in most cases. And certainly at the moment, as I read the record, I see that what the defense counsel was doing was in not reiterating that objection, was hammering home that Poholik's earlier testimony did not meet with the stipulation. It was totally wrong and discredited her. And would you also agree with me that if it had overruled the objection, or that you would have had a tough road to hoe to argue that that evidence that came in was harmless? That it was harmless? Yeah, in other words, if it had overruled the objection, the defendant appeals. Of course, the state argues harmless error, right? That's what you do when... Well, certainly, when you consider all the testimony, Your Honor, this was a very small portion of the testimony. There was tremendous testimony that directly implicated defendant in both the charges. This was a really quite minor portion of the testimony overall. It gets a little more blown out of proportion when it's treated as an issue on an appeal, and we spend pages and pages discussing it. But in a period of seconds in the trial, it goes by and you hear all this evidence from the victim herself about what happened to her, from her mother, from her aunt, from doctors, all this. This was a... As I said, this really would be a harmless error. Your Honor, if you have no more questions, I'm going to reline my brief for all earlier argument. Okay. Thank you, Mr. Cross. Thank you. Mr. Kessler. Thank you, Your Honor. We do think this was an important point. It's very damaging to the defense to allow the nurse to go beyond the stipulation. They've gotten what they needed. And as counsel pointed out, this was an invasive and hostile witness, so we think it was an error to push her when you didn't need to. But even beyond that, though, it was an error not to correct that first error. When you get the answer that's not part of the stipulation, you should move to strike and have it stricken. And the first issue, again, I can't emphasize enough the one, this child chooses her own words. She says spit, which doesn't support the conviction. It requires contact in this case. So if there's no questions, Your Honor, I just thank you for letting me ask you three minutes. Thank you, Mr. Kessler. Thank you, Mr. Cross, for your argument today. We will take this matter under advisement. Thank you for the written disposition within a short day. And I'll take a short recess from the commission.